# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **JANICE KIRBERG,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:04CV00083 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | By: James P. Jones |
| **COMMISSIONER OF** | ) | United States District Judge |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| Defendant. | ) | |

In this social security case, I affirm the final decision of the Commissioner.

## I. Background.

Janice Kirberg filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's claim for a period of disability and disability insurance benefits ("DIB") under title II of the Social Security Act, 42 U.S.C.A. §§ 401-433 (West 2003 & Supp. 2005) ("Act"). Jurisdiction of this court exists pursuant to 42 U.S.C.A. § 405(g).

My review under the Act is limited to a determination as to whether there is substantial evidence to support the Commissioner's final decision. If substantial evidence exists, this court's "inquiry must terminate," and the final decision of the

Commissioner must be affirmed. *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Id.*

Janice Kirberg first applied for benefits on July 8, 1997, alleging disability since January 16, 1997, and received a hearing with an administrative law judge ("ALJ") on December 22, 1998. In a decision dated February 19, 1999, the ALJ found that the plaintiff was not under a disability. The plaintiff filed an action in this court, and on January 22, 2002, a judge of this court adopted a magistrate judge's recommendations, finding that substantial evidence supported the ALJ's decision regarding the plaintiff's residual functional capacity. The court remanded the case so that the ALJ could determine, with vocational expert testimony, whether the plaintiff could perform other work existing in significant numbers in the national economy.

On January 24, 2001, the plaintiff filed a second DIB application claiming the same onset date, and adding allegations of exhaustion, memory loss, headaches, anxiety, and panic attacks to the original allegations of disability. After her claim was denied initially and on reconsideration, the Commissioner consolidated the plaintiff's two claims for benefits and held an additional administrative hearing on July 16,

2002. In an opinion dated September 24, 2002, the ALJ found that the plaintiff was not disabled within the meaning of the Act. The Social Security Administration's Appeals Council denied review, and the ALJ's opinion constitutes the final decision of the Commissioner.

## *II. Facts*.

Kirberg is forty years old and has completed high school. She has past work experience as a sewing machine operator, assistant manager at a fast food restaurant, and as a communications assistant and relay operator for a phone company. The plaintiff alleges disability due to fibromyalgia, anxiety, fatigue, headaches, memory loss, and pain. She has not engaged in substantial gainful activity since her onset date on January 16, 1997.

The plaintiff's medical history relevant to her onset date is extensive, spanning nearly ten years of frequent doctor visits and hospitalizations. Because this court has determined previously that the plaintiff's medical record prior to February 19, 1999, supports a finding that she was not under a disability at that time, I will only summarize the medical evidence that was neither evaluated by the ALJ in 1999 nor this court in 2001.

The plaintiff regularly saw Karen Stallard, F.N.P., and Thomas Cortellesi, D.O., beginning in July 1998. The office notes relevant to the current claim begin on February 15, 1999, when the plaintiff reported that she had been "very depressed" since her initial disability hearing in December 1998, but that other than depression and anxiety, she had been doing well. (R. at 552.) At an April 21, 1999 visit, the plaintiff reported on and off problems with her fibromyalgia, and that it prevented her from finishing yard work that she started. (R. at 551.) She also reported episodes of anxiety and depression related to the effects of fibromyalgia. (*Id*.) Further, the plaintiff reported that she had begun smoking as a result of the stress brought on by her medical condition. (*Id*.) On July 15, 1999, the plaintiff returned for a three-month evaluation at which she reported doing fairly well with good and bad days. (R. at 550.) She reported a fibromyalgia flare-up that had occurred two weeks prior caused by changes in the weather. (*Id*.)

On November 23, 1999, Stallard saw the plaintiff, at which time she reported depression and a desire to restart Paxil, a cycle of good days and bad days, and that she smokes three quarters of a pack per day. (R. at 680.) Stallard prescribed drugs for depression, pain, and assistance sleeping. (*Id*.)

On March 22, 2000, the plaintiff was seen by Karen Stallard, and complained that she was "worse than she'd ever felt," and that she was experiencing fatigue and

- 4 -

burning in her feet. (R. at 679.) Among other recommendations, Stallard encouraged the plaintiff to decrease her caffeine intake, stop smoking, and continue on her current medications. (*Id.*)

On May 30, 2000, the plaintiff saw Karen Stallard again, at which time she complained of fatigue, aches, pain, and insomnia related to fibromyalgia, decreased concentration, and feeling as though she was "in a fog." (R. at 677.) The plaintiff reported limitations on her activities and her ability to play with her son. (*Id.*) The plaintiff reported taking medications that improved some of her conditions, but that it was difficult for her to afford them. (*Id.*) A decrease in visit costs allows her to see Dr. Molina in Big Stone Gap. (*Id.*) She reported that she stayed at home most of the time. (*Id.*) Stallard encouraged routine activity and a normal activity-sleep-wake cycle. (R. at 678.)

On October 23, 2000, Stallard again saw the plaintiff, who complained that her condition had worsened with a change in the weather. (R. at 676.) The plaintiff also reported that she was smoking a pack a day and had lost twelve pounds, and requested a Lidocaine injection in the right scapular area at the site of a trigger point. (*Id.*) Stallard encouraged the plaintiff to undergo a stress test, gave the requested injection, and noted multiple trigger points and a spasm in the upper midscapular area.

- 5 -

On April 26, 2001, the plaintiff reported to Stallard that she was "hoping for disability." (R. at 685.) On September 19, 2001, the plaintiff saw Stallard again and reported increased sleepiness plus the usual fatigue, and aches and pains consistent with exacerbation of fibromyalgia. (R. at 684.) Stallard encouraged exercise and a routine sleep-wake cycle, prescribed medication for pain, and noted that the plaintiff was interested in seeing a chiropractor. (*Id.*)

On July 15, 2002, Stallard completed a Medical Assessment to do Work-Related Activities (Physical) at Kirberg's attorney's request. (R. at 722.) Stallard stated that fibromyalgia prevented the plaintiff from lifting more than five pounds. (*Id.*) She said the plaintiff could only sit, stand, or walk for three hours per workday due to her inability to be in any position for "long periods." (*Id.*) The plaintiff could not climb, stoop, kneel, balance, crouch, or crawl, and was limited in her ability to reach, handle, feel, push, pull, see, hear, and speak due to fibromyalgia and anxiety and depression. (*Id.*) Stallard reported all listed environmental restrictions. (R. at 724.)

Beginning in January 1998, the plaintiff began seeing Zafar Ahsan, M.D., of Appalachian Neurological and Psychiatric Services upon referral of Dr. Cortellesi. At a January 20, 1998 office visit, the plaintiff reported that she was depressed, had lost interest in "everything," suffered from frequent crying spells, social withdrawal,

- 6 -

Case 2:04-cv-00083-JPJ-PMS   Document 15   Filed 03/20/06   Page 6 of 13   Pageid#: 88

low energy, excessive feelings of guilt, and difficulty concentrating, but that she slept well and had a good appetite. (R. at 397.) The plaintiff reported that her medications only improved her sleep. (*Id.*) The doctor noted a history of depression, but reported that because the plaintiff had applied for disability benefits, he could not rule out issues of secondary gains. (R. at 398.) Dr. Ahsan diagnosed the plaintiff with depression, fibromyalgia, and reported a global assessment of functioning ("GAF") of 80 presently, and 90 in the past. (*Id.*) The doctor recommended that the plaintiff return for a follow-up with Ross Baker, L.C.S.W., and continue individual counseling at Clintwood Mental Health. (*Id.*)

Dr. Ahsan saw the plaintiff again on December 19, 2001, during which time the plaintiff complained of panic attacks induced by having to leave the house. (R. at 395.) The plaintiff also reported loss of appetite, frequent crying spells, lack of energy and motivation, social withdrawal, and anxiety with panic attacks. (*Id.*) The plaintiff further reported that she had seen a counselor at Clintwood Mental Health until a year prior when her symptoms had improved and she discontinued her visits. (*Id.*) Three months later, Dr. Cortellesi restarted the plaintiff on medication. (*Id.*) Dr. Ahsan reported the plaintiff's GAF at 90 in the past, and 70 currently. The doctor recommended that the plaintiff increase her antidepressant dosage and continue on

her sleep aid. (R. at 396.) He also recommended that she see Ross Baker, L.C.S.W., for further evaluation, individual supportive therapy, and case management. (*Id*.)

The plaintiff was seen by Ross Baker, L.C.S.W., on January 16, 2002, for an individual therapy session. (R. at 393.) The plaintiff reported a poor appetite, crying spells, lack of energy and motivation, and panic attacks. (*Id*.) The plaintiff received relaxation training and instruction in deep level breathing exercises to reduce anxiety. (*Id*.) The clinician reported that the plaintiff was improving and was compliant with treatment. (*Id*.) Along with depression, Kirberg was diagnosed with a hypothyroid condition. (*Id*.)

On February 14, 2002, Ross Baker saw the plaintiff for an individual therapy session. (R. at 392.) The plaintiff reported continued anxiety and panic attacks, and that she had been tested for a thyroid disorder but that the results were not yet available. Office notes indicate that the plaintiff was improving and was compliant with treatment. (*Id*.)

On March 24, 2000, Galileo Molina, M.D., saw the plaintiff who complained of fibromyalgia, mild pain all over, fatigue, burning sensation in the feet, and intermittent heart fluttering. (R. at 627.) She also complained of sleeping poorly, and of feelings of nervousness and depression. (*Id*.) The doctor reported finding multiple areas of mild tenderness in the upper and lower back, but that evaluations of other

- 8 -

areas were unremarkable. (*Id.*) Dr. Molina assessed anxiety depression syndrome, possible fibromyalgia syndrome, and multiple skin tags. The plaintiff was seen on April 3, 2000 for skin tag removal, and for stitch removal on April 11, 2000. (*Id.*)

Dr. Kevin Blackwell performed a consult exam on the plaintiff on May 12, 2001. (R. at 646.) The plaintiff's chief complaint was fibromyalgia. (*Id.*) The plaintiff reported no specific joint swelling, but allover joint stiffness, deep bone pain while walking, and greater problems with her lower extremities than with her upper extremities. (*Id.*) Dr. Blackwell noted that the plaintiff's cervical, thoracic, and lumbar spines showed full range of motion with no abnormal curvatures, tissue texture changes, or spasms or deformities. (*Id.*) Upper and lower joint extremities revealed no swelling, redness, or restriction of motion, though there was tenderness in the lumbar and in the legs with palpation. (*Id.*) Dr. Blackwell found normal deep tendon reflexes in the upper and lower extremities, which were also normal for size, shape, symmetry, and strengths. (*Id.*) He noted more severe tenderness in areas along the shoulders, clavicle bones, and ankles. (*Id.*) The plaintiff's flexion was full at standing along with squatting; however she displayed grimaces at approximately thirty degrees of hip flexion and forty-five degrees of squatting. (*Id.*) X rays of the plaintiff's lumbar spine and knees were essentially normal. The plaintiff had some mild degenerative changes in her thoracic spine. (R. at 650.) Dr. Blackwell's

- 9 -

Case 2:04-cv-00083-JPJ-PMS  Document 15  Filed 03/20/06  Page 9 of 13  Pageid#: 91

assessment was fibromyalgia, by history. (*Id.*) Dr. Blackwell stated that the plaintiff seemed quite physically capable of performing most activities asked of her, standing and sitting should not produce too much difficulty, and that lifting a reasonable amount of weight for her age would also be acceptable. (*Id.*) Dr. Blackwell also noted that he did not see any significant abnormalities to the spine or joints. (*Id.*)

The plaintiff received treatment at Wellmont Lonesome Pine Hospital on four occasions from September 19, 2001, through February 14, 2002. On September 19, 2001, the plaintiff was assessed with fibromyalgia; on January 10, 2002, with abdominal pain; on January 17, 2002, with hypokalemia; and on February 14, 2002, with hypothyroidism. (R. at 712-720.)

Dr. Matthew Beasey examined the plaintiff on June 11, 2002, upon referral by Karen Stallard, FNP, for endocrine consultation. (R. at 731.) The plaintiff reported fatigue, depression, insomnia, tachycardia, and headaches. (*Id.*) Dr. Beasy noted no apparent distress. (R. at 732.) Examination of the extremities showed no clubbing, cyanosis, or edema. (*Id.*) Dr. Beasy's diagnoses were Hashimoto's disease (which he stated was a chronic illness that could wax and wane), elevated glucose, obesity, fatigue, and depression. (*Id.*) Dr. Beasy noted that the plaintiff has non-medical causes for fatigue, including obesity and lack of exercise. Dr. Beasy placed the

plaintiff on a 1,500 calorie-per-day diet, and recommended increased exercise, and smoking cessation. (*Id.*)

Based upon the evidence, the ALJ determined that although the plaintiff has a severe impairment or combination of impairments, those impairments do not meet or medically equal one of the impairments listed in the Act. Further, the ALJ determined that the plaintiff's allegations regarding her limitations were not entirely credible, and that the plaintiff retains the residual functional capacity to perform a significant range of unskilled sedentary work which is available in the national economy. Finally, the ALJ concluded that the plaintiff was not under a disability, and was thus ineligible for DIB benefits.

### *III. Analysis.*

Kirberg asserts that the ALJ's decision is not supported by substantial evidence. Specifically, she argues that the ALJ erred in finding that there is work in the national economy that the plaintiff is capable of performing.

As indicated above, this originally remanded this case for determination of whether there was sedentary, unskilled work in the national economy that Kirberg was able to perform. The regulations required the ALJ, having originally determined that the plaintiff was unable to perform the full range of sedentary work, to rely on

the testimony of a Vocational Expert ("VE"). The VE at the previous hearing had been asked to respond to a hypothetical question fairly portraying Kirberg's impairments to determine whether work was available to her. The court found that the VE's testimony had failed to demonstrate that unskilled jobs within Kirberg's capabilities were available in the national economy. At the more recent hearing, the ALJ's questions to the VE focused only on that issue; the VE testified that the jobs he had listed previously[1] were indeed unskilled jobs and were available in the national economy.

Kirberg asserts that in relying on testimony given during the previous hearing, the ALJ failed to take into consideration the new medical records offered to support Kirberg's new claim for disability benefits, and that this was erroneous because Kirberg's condition had worsened since the last hearing. Thus, she alleges, the hypothetical posed to the VE was not based on a consideration of Kirberg's current condition and fails the "substantial evidence" test.

In reviewing the record, however, I find that the ALJ carefully reviewed all of the new medical evidence that had been submitted by Kirberg in relation to her second application for DIB benefits. As the ALJ determined, it is clear from a review

---

[1] Those jobs included administrative support worker, assembler, hand painter, decorator of crafts, production, inspector checker, and towel or drapery folder.

of the record that the evidence most supportive of Kirberg's position was that proffered by Karen Stallard, a family nurse practitioner, and that Stallard's conclusions were drawn substantially from Kirberg's subjective complaints, rather than from objective medical and other clinical tests. Further, the ALJ properly discredited Kirberg's own statements about her limitations as inconsistent with her own reports of her actual activities.

I find that the ALJ thoroughly reviewed all of the records presented regarding Kirberg's original and subsequent applications for benefits, and that the ALJ's decision is supported by substantial evidence in the record.

## *IV. Conclusion.*

For the foregoing reasons, the Commissioner's motion for summary judgment will be granted. An appropriate final judgment will be entered.

ENTER: March 20, 2006

/s/ JAMES P. JONES
Chief United States District Judge

- 13 -

Case 2:04-cv-00083-JPJ-PMS   Document 15   Filed 03/20/06   Page 13 of 13   Pageid#: 95